**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-23-08027-001-PCT-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| Philip Alejandro Powers, III, | |
| Defendant. | |

Defendant Phillip Alejandro Powers, III, appeals an order and judgment by the Magistrate Judge ("MJ") requiring him to pay $293,413.71 to the United States government for starting three separate fires—which spread to 230 acres in size—when he went off trail from a hike in northern Arizona. Powers argues that starting these fires is protected by the necessity defense because they were necessary to save his life, and that the MJ erred when she found it did not apply to his case. For the reasons listed below, the Court will affirm in part and remand in part so that the MJ may modify two provisions in the judgment as further explained below.

**I.   BACKGROUND**

   **A.   Powers Plans a Hike**

Powers was 37 years old, and had been an Arizona resident for 30 years, when he went on a hike in northern Arizona on May 27 and May 28, 2018. (Doc. 27-3 at 12–13.) Powers thought he was going to take a 17.8-mile hike called the "Taylor Cabin Loop," in a remote part of the Coconino and Prescott National Forests near Sedona, Arizona. (*Id.*)

He had some hiking experience but testified that he had not been on a lengthy hike for several years, and that he had never hiked the Taylor Cabin Loop. *(Id.)* Powers researched the Taylor Cabin Loop hike from a book called "A Falcon Guide, Hiking Arizona, A Guide to the State's Greatest Hiking Adventures." *(Id.)* That book describes the Taylor Cabin Loop as a strenuous 18.8-mile hike that would take about twelve hours or two days to hike, and that there is usually water in Sycamore Creek during the spring, but the water dries up later in the year. *(Id.* at n.2.) Another hike, called the "Cabin Loop," is about 50 miles away from the Taylor Cabin Loop hike and is considered moderately difficult that takes about two days to complete. *(Id.)* The MJ noted that "Powers seemed confused about which hike he actually attempted" and he "provided information about the wrong hike to [Retired United States Forest Service ("USFS") Law Enforcement Officer Michael O'Neil]." (Doc. 27-2 at 41.)

Powers began his hike sometime between 6:00 and 7:00 in the morning of the 27th. (Doc. 27-4 at 61.) He packed 100 ounces of water in a bladder on his backpack and also had approximately 16 ounces in a separate bottle. (Doc 27-4 at 20, 57.) Altogether, Powers had about 116 fluid ounces of water for the entire hike. *(Id.* at 57.) For reference, one gallon of water contains 128 fluid ounces.

Powers knew the importance of carrying sufficient water and emergency gear while hiking. *(Id.* at 48.) He was familiar with Arizona fire restrictions, and Powers knew the area of his hike was subject to fire restrictions at the time. *(Id.* at 45–46, 123–28.) When Powers arrived at the trailhead, it was hot and dry. *(Id.* at 57.) There were no water sources in the immediate area. *(Id.* at 61.) At trial, Powers testified that he knew he would not find water once he arrived at the trailhead. *(Id.* at 73.) Powers had no water purification tablets or devices with him. (Doc. 27-4 at 89–90.) He also left his water filter in his vehicle at the trailhead. *(Id.)* Ultimately, Powers failed to find a water source on the hike. (Doc 27-4 at 70.) Powers also failed to take a signaling device with him on the hike. *(Id.* at 91.) He also failed to take a medical or first-aid kit. *(Id.)* Powers, however, brought a vape pen with him. *(Id*. at 91–92; Doc. 27-5 at 43.) He also had both a machete and a Ka-Bar knife with

him, either of which could have been used to dig or make a fire ring or pit. (Doc. 27-3 at 198.)

Powers made it to the Taylor Cabin in the Coconino National Forest. (Doc. 27-4 at 64.) Powers intended to hike the Taylor Cabin Loop and end back at the trailhead parking lot. (*Id.* at 16.) But he lost the trail several miles past the Taylor Cabin. (*Id*. at 65–66.) Powers thought he had about four miles to finish the loop and end back at the parking lot. (*Id.* at 66.) Powers, however, got lost. *(Id*. at 66–70.)

Powers' only global positioning system ("GPS") was the one featured on his smart phone. (*Id.* at 67.) But it did not work for lack of a cellular phone signal. (*Id.* at 68–70, 90.) Powers did not have a separate paper map or a compass. (*Id.* at 90.)

### B.    Powers Returns to Taylor Cabin

After getting lost on the Taylor Cabin Loop, Powers returned to the Taylor Cabin for the night. (Doc. 27-4 at 26.) He had planned for a day hike, not an overnight hike. (*Id.* at 55.) His cellphone could not get a signal and eventually ran out of battery. (Doc. 27-3 at 148; Doc. 27-4 at 26–27, 95.) Powers had a small amount of food with him and found some food that was stored at the Taylor Cabin. (*Id.* at 27, 57–58.) He saved about 16 to 20 ounces of water for the morning. (Doc. 27-4 at 70–71.) He also sought to return to the trailhead that he had taken the previous day, and no longer attempted to complete the Taylor Cabin Loop. (Doc. 27-4 at 33, 83.) Because Powers got lost and had to return to the Taylor Cabin, his anticipated 17.8-mile hike became much longer, possibly more than 20 miles. (Doc. 27-3 at 14.) Powers acknowledged that he did not have enough water for the entirety of the return hike. (Doc. 27-4 at 96–97.) At trial, Powers claimed that he was properly prepared— if the trail had not been so difficult to find past the Taylor Cabin. (Doc. 27-4 at 96.)

### C.    Powers Ignites Three Separate Fires

Between the evening of May 27 and the morning of May 28, 2018, Powers purposefully, voluntarily, and admittedly set three separate fires in the National Forest. (Doc. 27-4 at 31, 40, 73, 82–83, 87, 95.) Powers testified that he started them as signal fires seeking help. (Doc. 27-4 at 32, 40, 43.)

The first fire was later named the "Taylor Fire," and was started around the Taylor Cabin in the Coconino National Forest. (Doc. 27-3 at 135–36; Doc. 27-4 at 133.) Powers started the Taylor Fire at around 9:00 p.m. on May 27. (Doc. 27-3 at 178–79, 189; Doc. 27-4 at 31.) Although there was a fire pit very close to the Taylor Cabin, only a few feet from where he started the Taylor Fire, he decided not to use it. (Doc. 27-3 at 91–92, Doc. 27-4 at 33, 77; Doc. 27-5 at 34–36.) He also failed to clear any brush or flammable material away before starting the fire. (Doc. 27-3 at 152–52; Doc. 27-4 at 77–79.) The Taylor Fire burned approximately .10 acres (including grass, brush, small trees, and timber) before going out on its own—not by Powers' doing. (Doc. 27-3 at 91–92; Doc. 27-4 at 74.)

Powers tried to start the hike back to the trailhead parking lot early in the morning on May 28, 2018, while it was still dark, due to the anticipated heat of the day. (Doc. 27-4 at 26, 78–81.) He ate a small breakfast before he started the return hike. (*Id.* at 71.) A few miles into the hike back, Powers explained that his legs began to cramp, he could only hike short distances before having to stop, and had to rest in the shade to try and "collect energy." (Doc. 27-4 at 34, 78.)

That morning, Powers ignited his second fire, later named the "Sycamore Fire," in the Prescott National Forest near the boundary of the Coconino National Forest. (Doc. 27-3 at 136–37; Doc. 27-4 at 82–83, 133.) Powers stayed around the Sycamore Fire for about an hour hoping that the smoke would attract help—he also thought the fire was going out. (*Id.* at 35–36, 85.) Powers admitted that the Sycamore Fire was still smoldering when he walked away from it. (*Id.*; Doc. 32 at Exhibit 8, 35:42 36:01 ("It wasn't that big when I left it. I thought it was going out.").) Like the Taylor Fire, Powers did not start the Sycamore Fire in a fire ring or pit; he instead ignited it in the "snag" of a dead tree. (Doc. 27-3 at 152–53; Doc. 27-4 at 84.) And again, Powers did not clear any brush or flammable material away before starting the fire. (Doc. 27-3 at 152; Doc. 27-4 at 84.) The Sycamore Fire eventually spread and burned beyond Powers' control, destroying approximately 230 acres of the National Forest in the District of Arizona and burning grass, brush, and timber in a National Forest. (Doc. 27-3 at 153, 162, 171; Doc. 27-4 at 134–50; Doc. 27-5 at 1–28.)

The third fire, also set that morning, was later named the "Sycamore 2 Fire." (Doc. 27-3 at 134, 155; Doc. 27-4 at 38, 47, 87, 133.) Powers started it after seeing an aircraft overhead, as he was concerned that the aircraft might not see him due to his camouflage clothing. (Doc. 27-4 at 38–39, 87–88.) Again, Powers did not ignite the Sycamore 2 Fire in a fire ring or pit, nor did he clear any brush or flammable material away before starting the fire. (*Id.* at 87.) It burned a small area of grass and brush in the National Forest. (Doc. 27-3 at 172; Doc. 27-5 at 29–33.)

At the time of the fires described above, both the Coconino and Prescott National Forests were under Stage 2 fire restrictions. (Doc. 27-3 at 71–72, 137–38; Doc. 27-4 at 45, 123–28.) Stage 2 fire restrictions prohibit individuals from building, maintaining, attending, or using a fire without a permit. (Doc. 27-3 at 138; Doc. 27-4 at 123–28.) Powers knew the forests were dry and in fire restrictions before he started his hike and did not have a permit to start any of the three fires. (Doc. 27-3 at 138; Doc. 27-4 at 45, 57, 61, 73.)

### D.  Powers is Rescued

Shortly after Powers started the Sycamore Fire, the USFS in the Red Rock Ranger District of the Coconino National Forest received reports of smoke and a fire. (Doc. 27-3 at 78, 138–40.) A USFS helicopter was sent to the area. (*Id.* at 78.) Mr. Badger, who is a fire management officer and was aboard the helicopter, saw Powers under a tree and assisted him into the helicopter, and he was then flown to the Sedona, Arizona airport, where an ambulance was waiting. (*Id.* at 78, 80–82, 140–41.) Mr. Badger stayed on the scene of the Sycamore Fire for about five days. (*Id.* at 96–97, 101.) He and others hiked to the Taylor Cabin to inspect and assess the Taylor Fire. (*Id.* at 85–86.) Mr. Badger found that the Taylor Fire—the first fire Powers set—scorched nearly .10 acres before it burned out. (*Id.* at 91.)

With respect to Powers' second fire—the Sycamore Fire—it took nearly nine days to contain. (Doc. 27-6 at 50.) Because the Sycamore Fire was ignited in a remote area, the USFS fought the fire with both air assets (like helicopters) and firefighters on the ground. (*Id.*) The Sycamore Fire was also a potential threat to the Flagstaff area and the nearby

watershed, and the USFS had to expend considerable resources to contain it from spreading further. (Doc. 27-3 at 84–85, 100–01, 158–59.) The parties stipulated that the USFS sustained $293,413.71 in recoverable fire suppression costs for the Sycamore Fire. (Doc. 27-6 at 50–51.)

### E.     Powers' Medical Treatment

Powers' medical records for treatment he received after being evacuated from the area of the fire show that he was dehydrated. (Doc. 27-6 at 54–75.) Powers was treated by, among others, Dr. Jeff Davison Hardin. (Doc. 27-3 at 205, 224; Doc. 27-6 at 54–75.) Dr. Hardin testified that Powers was moderately dehydrated and suffering from heat exhaustion (but not heat stroke), early onset renal failure (for which he did not need dialysis and was recovering), and rhabdomyolysis. (Doc. 27-3 at 215, 220–21, 224–25, 227–28.) Dr. Hardin, however, could not be certain that the rhabdomyolysis was caused by dehydration. (*Id.* at 226.) He explained that it could have been caused by the exertion during the strenuous hike. (*Id.*) With respect to Powers' dehydration, Dr. Hardin testified that while Powers' case was moderate, if left untreated for another 24 to 48 hours, it would have been life threatening. (*Id.* at 215, 230–31.)

### F.     Powers' Charges

On October 6, 2021, the United States filed a seven-count Complaint against Powers. (Doc. 27-7 at 11–30.) Powers was charged with one count of leaving a fire unattended and unextinguished in a National Forest in violation of 18 U.S.C. § 1856, three counts of unlawfully building a fire in a National Forest during fire restrictions in violation of 36 C.F.R. § 261.52(a), and three counts of unlawfully causing timber, trees, brush, and grass to burn in a National Forest without a permit in violation of 36 C.F.R. § 261.5(c). (*Id.* at 11–12.) Each charge is a Class B misdemeanor. Powers rejected various plea offers, and the matter was set for a bench trial. (*Id.* at 8–9, 35–37.)

### G.     Powers' Bench Trial

Magistrate Judge Bibles tried Powers' case on November 2 and 3, 2022. (Doc. 27-2 at 37.) At the close of the United States' case, Powers moved for a judgment of acquittal

as to Count 1 of the Complaint arguing that he did not have criminal intent for the 18 U.S.C. § 1856 charge based on *United States v. Launder*, 743 F.2d 686 (9th Cir. 1984). (Doc. 27-3 at 2–6, 291–93.) The MJ denied that motion. (Doc. 27-4 at 5.) During closing arguments, counsel for Powers raised a necessity defense for the first time. (Doc. 27-2 at 59–60; Doc. 27-4 at 112–17.) Powers was found guilty of all seven charges. (Doc. 27-2 at 2–5.) He was sentenced to one year of supervised probation, concurrent, on each of the seven counts of the Complaint. (*Id.*) Powers was also ordered to pay restitution in the amount of $293,413.71. (*Id.*) On February 17, 2023, he timely appealed to this Court. (Doc. 27-7 at 31–32.)

## II.    STANDARD OF REVIEW

18 U.S.C. § 3402 provides this Court with jurisdiction over the instant appeal. It states: "In all cases of conviction by a United States magistrate judge an appeal of right shall lie from the judgment of the magistrate judge to a judge of the district court of the district in which the offense was committed."

Federal Rule of Criminal Procedure 58(g)(2)(D) outlines the scope of appeal for petty offenses and other misdemeanors, which "is the same as in an appeal to the court of appeals from a judgment entered by a district judge"—specifically, "[t]he defendant is not entitled to a trial de novo by a district judge." And "[a]cting as an appellate court, this Court has the power to 'affirm, modify, vacate, set aside or reverse' the magistrate judge's order and 'may remand the cause and direct the entry of such appropriate judgment, decree or order, or require such further proceedings to be ha[d] as may be just under the circumstances.'" *United States v. Ramirez*, No. CR F 08-0239 LJO, 2008 WL 5397497, at *2 (E.D. Cal. Dec. 24, 2008) (citing 28 U.S.C. § 2106).

This Court on appeal reviews questions of law *de novo* and findings of fact for clear error. *United States v. Oberdorfer*, No. 3:12-CR-00578-BR, 2014 WL 1343427, at *6 (D. Or. Apr. 3, 2014) (citing *United States v. Ziskin*, 360 F.3d 934, 943 (9th Cir. 2003); *United States v. Perdomo-Espana*, 522 F.3d 983, 986 (9th Cir. 2008)). Mixed questions of law and fact are subject to *de novo* review; however, the factual findings that underlie the

application of the law are reviewed for clear error. *United States v. Prieto-Villa*, 910 F.2d 601, 604 (9th Cir. 1990).

## III. DISCUSSION

The issue presented here is whether the MJ erred when she denied Powers' necessity defense, and found him guilty of leaving fires unattended and unextinguished, violating fire restrictions, and causing timber to burn without a permit. (Doc. 27-2 at 2.) Powers argues he had to act unlawfully to prevent his own death and that the MJ erred when she concluded that the necessity defense was inapplicable. (Doc. 27 at 15.) Powers appeals (1) the MJ's application of the facts to the elements of the necessity defense and (2) the MJ's analysis of his "recklessness" when evaluating his necessity defense.

### A. The Necessity Defense

The necessity defense is an affirmative defense that does not negate any of the elements of a crime but instead serves as a justification or excuse. *United States v. Sandoval-Gonzalez*, 642 F.3d 717, 723 (9th Cir. 2011). "Necessity is essentially a justification for the prohibited conduct: the 'harm caused by the justified behavior remains a legally recognized harm that is to be avoided whenever possible.'" *Raich v. Gonzales*, 500 F.3d 850, 861 (9th Cir. 2007) (quoting Paul H. Robinson, Criminal Law Defenses § 24(a) (1984 & Supp. 2006–2007)). "A common law necessity defense thus singles out conduct that is '[o]therwise criminal, which under the circumstances is socially acceptable and which deserves neither criminal liability nor even censure.'" *Id.* (citing LaFave, Substantive Criminal Law § 9.1(a)(3) (2d ed. 2003 & Supp. 2005)).

"The defense of necessity is available when a person is faced with a choice of two evils and must then decide whether to commit a crime or an alternative act that constitutes a greater evil." *United States v. Contento-Pachon*, 723 F.2d 691, 695 (9th Cir. 1984) (citing *United States v. Richardson*, 588 F.2d 1235, 1239 (9th Cir.1978)). Powers has attempted to justify his violation of 18 U.S.C. § 1856 and 36 C.F.R. §§ 261.5(c) and 261.52(a) by showing that the alternative, his death, was a greater evil. "Traditionally, in order for the necessity defense to apply, the coercion must have had its source in the physical forces of

nature." *Id.*

The Ninth Circuit model jury instruction for necessity states that "A defendant acts out of necessity only if at the time of the crime charged:"

> First, the defendant was faced with a choice of evils and chose the lesser evil;
> Second, the defendant acted to prevent imminent harm;
> Third, the defendant reasonably anticipated his conduct would prevent such harm; and
> Fourth, there were no other legal alternatives to violating the law.

Jury Instructions 5.8 (9th Cir. 2018). If "each of these things" is found "by a preponderance of the evidence" the defendant must be found not guilty. *Id.* "It is not enough . . . that the defendant had a subjective but unreasonable belief as to each of these elements. Instead, the defendant's belief must be reasonable, as judged from an objective point of view." *Perdomo-Espana*, 522 F.3d 983 at 988-89 (affirming the district court where it denied defendant's requested necessity jury instruction).

**B.    The MJ Did Not Err When She Found that the Necessity Defense Does Not Apply to Powers' Case.**

Powers argues that the MJ incorrectly found that Powers' death was not imminent. (Doc. 27 at 19–20.) This Court, respecting that the "magistrate judge's decision . . . is entitled to great deference," disagrees with Powers and finds that the MJ did not err when she precluded his necessity defense. *United States v. Abonce-Barrera*, 257 F.3d 959, 969 (9th Cir. 2001).

Dr. Hardin testified that when Powers arrived at the Sedona Emergency Department on May 28, 2018, he was diagnosed with "weakness, heat exhaustion, acute renal failure, rhabdomyolysis, and severe dehydration." (Doc. 27-3 at 206.) Dr. Hardin clarified that Powers suffered from heat exhaustion, which is not as severe as heat stroke. (*Id.* at 220–21.) He emphasized that "heat exhaustion could be anything from a mild headache to just feeling fatigued to feeling overheated and you need to rest from [] dehydration can be part of it." (*Id.* at 221.) Regarding Powers' rhabdomyolysis diagnosis, Dr. Hardin explained

that his case was "moderate . . . a little bit more towards mild than severe." (*Id.* at 225.) Dr. Hardin also explained that Powers' "renal failure" was "mild." (*Id.* at 227.) Dr. Hardin also testified that he was "not sure what the [dehydration] situation was with Mr. Powers." (*Id.* at 228.) On re-direct, Dr. Hardin testified that Powers:

> [P]robably would have died in that weather another 24 hours. You know, he came in midday. I'm not sure what time he was rescued. But in that heat—you know, we assume the heat was pretty high where he was at. And without any food or water. Possible if he stayed in the shade he could have survived another day, or even two, but unlikely. You know, it probably would have been fatal.

(*Id.* at 231.) The MJ, evaluating all of Dr. Hardin's testimony, found that "while these ailments could cause significant discomfort, Mr. Powers was not yet in a life-threatening state, which necessitated the actions of starting a series of fires" and that his "harm was not imminent." (Doc. 27-2 at 61–62.)

When evaluating all of Dr. Hardin's testimony and reviewing the MJ's analysis that Powers had a subjective and unreasonable belief that breaking the law would prevent imminent harm, this Court finds that the MJ did not clearly err. Dr. Hardin's testimony explained Powers' diagnoses were "moderate" and "mild," and also speculated on what could have happened, but without certainty.

Powers also argues that the MJ erred when she found there were other alternatives that he could have taken rather than starting a series of unrestrained fires. The Court again disagrees with Powers.

If "there was a reasonable, legal alternative to violating the law," the necessity defense fails. *United States v. Dorrell*, 758 F.2d 427, 431 (9th Cir. 1985) (citing *United States v. Bailey*, 444 U.S. 394, 410 (1980)). Here, Powers had such alternatives. Powers could have cleared one or more areas to start a signal fire. *See Launder*, 743 F.2d at 688 (Defendant "cleared an area on a rock ledge approximately five to ten feet across and, using small twigs, leaves and grass as fuel, lit a signal fire"). Powers could have also built a fire ring or dug a fire pit. With respect to the Sycamore Fire—the fire that destroyed 230

acres—Powers could have ensured that the fire was out before leaving it unattended in violation of 18 U.S.C. § 1856.

Powers also could have potentially avoided setting any fires overall had he properly prepared for the hike with a signaling device, compass or proper GPS device, and more water and food. *See United States v. Bibbins*, 637 F.3d 1087, 1094 (9th Cir. 2011) (agreeing with the district court's rejection of Defendant's necessity defense because he could have avoided the greater "evil" with legal alternatives like "[vocalizing the] need for medical help" or proposing "an alternative way to comply with the rangers' instructions.").

### C.    Necessity and Justification

Powers argues the MJ erred when she found the necessity defense inapplicable because (1) she evaluated whether Powers "created the conditions the conditions underlying the supposed necessity" and (2) found he was "reckless and negligent in his preparation for a hike of this magnitude from the outset." (Doc. 27 at 24–29.)

The Supreme Court explained that "the defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils." *United States v. Bailey*, 444 U.S. 394, 410, (1980). Powers argues, in his reply brief that "the Ninth Circuit plainly does not interpret this language as withdrawing the defense from anyone whose recklessness led to the circumstances creating the necessity—as reflected in the opinions cited above." (Doc. 37 at 13–14.) The opinions that Powers cites to, however, do not squarely address this issue. In those opinions, the court either did not discuss the necessity defense at all or was not presented with the precise issue here. *See United States v. Liu,* 731 F.3d 982 (9th Cir. 2013); *see also United States v. Schoon*, 971 F.2d 193 (9th Cir. 1991), *as amended* (Aug. 4, 1992); *United States v. Barnes*, 895 F.3d 1194 (9th Cir. 2018). Here, the MJ denied applying the necessity defense because (1) she found that Powers did not prove, by a preponderance of the evidence that he faced imminent harm or had no viable alternatives and (2) that Powers "created the conditions underlying the supposed necessity." (Doc. 27-2 at 61–64.)

Powers also argues that the MJ erred because she looked beyond the "elements of the necessity defense set forth in the Ninth Circuit's [Necessity] model instruction." (Doc. 27 at 24.) And that she impermissibly looked to justification instruction, referencing a defendant "not recklessly plac[ing] himself in a situation where he would be forced to engage in criminal conduct." (*Id.* at 25 (quoting Model Criminal Jury Instruction 5.9, Justification (9th Cir. 2022).) Powers argues that "had the Ninth Circuit intended for the defendant's lack of responsibility to be an element of the necessity defense, the court would have included it in its Necessity instruction as well." (*Id.* at 25.) But model jury instructions are not statutes. In fact, the Ninth Circuit itself in its Introduction to the Model Criminal Jury Instructions:

> As the title states, these instructions are only models. They are not mandatory, and they have been neither adopted nor approved by the Ninth Circuit . . . They also must be carefully reviewed, with additional legal research and analysis performed when needed, before being used in any specific case, and they should be tailored or modified when appropriate.

Model Criminal Jury Instructions, Introduction (9th Cir. 2021). In his reply brief, Powers correctly clarifies that the instruction "accurately" reflects the elements laid out in Ninth Circuit case law. *See. Schoon*, 971 F.2d at 195. But Powers' attempt to narrowly look at some parts of Ninth Circuit precedent but ignore other binding precedent is unavailing. For example, Powers relies on *Barnes*, 895 F.3d at 1205 n.4, for the proposition that where the "defendant has 'distinctly raised a defense of necessity,' rather than of justification, the court must determine whether the defendant 'met the requirements to present a necessity defense, not a justification defense.'" (Doc. 27 at 25.) But in *Barnes*, the Ninth Circuit clarified that treating "necessity and justification as separate and distinct defenses" arose "in felon-in-possession cases," which is inapplicable here because this is not a felon-in-possession case. *Barnes*, 895 F.3d at 1205, n.4. The court also explained that, "[g]enerally speaking, necessity—typically presented as a situation where the actor claims he chose 'the lesser of two evils'—is a type of justification defense." *Id.* Furthermore, when the court reviewed Barnes' "evidence to determine whether he has sufficiently made out a case for

- 12 -

necessity" it "conclude[d] that he has not, under either the test for necessity or for justification." *Id.* Powers' argument that no justification analysis may seep into a necessity analysis is also meritless given that the Ninth Circuit has evaluated the justification defense when the preclusion of a necessity defense was at issue. In *Perdomo-Espana*, 522 F.3d 983, for example, at issue was whether the necessity defense operates on an objective or subjective framework. In reaching the conclusion that the necessity defense required an objective framework, the court examined the justification defense. It explained:

> In *United States v. Simpson*, 460 F.2d 515 (9th Cir. 1972), moreover, while discussing justification defenses more broadly, we said:
>
>> The theoretical basis of the justification defenses is the proposition that, in many instances, society benefits when one acts to prevent another from intentionally or negligently causing injury to people or property. That benefit is lost, however, and the theory fails when the person seeking to avert the anticipated harm does not act reasonably.
>
> *Id.* at 517-18. Embedded in our recognition that a person who seeks to benefit from a *justification defense must act reasonably is the principle that justification defenses necessarily must be analyzed objectively*.

*Id.* at 987–88 (emphasis added).

Applying a *de novo* review here, the Court concludes that because *United States v. Bailey*, 444 U.S. 394, 410 (1980), is binding precedent, it must look to whether Powers is "covered" by the "defense of necessity, or choice of evils," because there were "physical forces beyond [his] control" justifying the "illegal conduct" for "the lesser of two evils" or whether he placed himself in such physical forces. *Id.* at 987.

Although the Court sympathizes with Powers—he, and he alone—placed himself in the physical forces that led him to violating the law. He decided to go on a hike by himself

in northern Arizona in late May when the weather is unforgiving. He did not adequately plan or prepare for his hike. He failed to bring enough water, food, or the appropriate equipment such as a signaling device or an appropriate GPS. Had Powers, an experienced hiker, adequately planned and prepared for his hike, he would not have found himself in such circumstances. The Court therefore concludes that Powers' necessity defense fails because his irresponsibility created those physical forces and were not beyond his control. *Bailey*, 444 U.S. at 410.

The MJ did not clearly err when she found that "Powers was reckless and negligent in his preparation for a hike of this magnitude from the outset." (Doc. 27-2 at 62.) Powers, an Arizona resident and self-proclaimed experienced outdoorsman, was ill-prepared for a relatively long and strenuous hike in a wilderness area under Stage 2 fire restrictions and daytime temperatures over 100 degrees Fahrenheit. (*Id.* at 63.) First, Powers failed to pack enough water and only brought with him 116 ounces. (*Id.*) During trial, Dr. Hardin was asked to opine on "how much water or fluid would a person need to be doing an 18-mile hike in the forest in Sedona in a 90-plus degree or even 100-degree heat?" He responded with, "Yikes. I don't know. If they were smart, they would—they would get up at 4:00, when it's cool, and be done by 8:00, which is what I do in the Grand Canyon . . . I would speculate if you're over 100 degrees Fahrenheit and you're hiking in the high desert, then you—probably several gallons to survive that." (Doc. 27-3 at 223–24.)

Dr. Hardin also testified that a regular person sitting in the shade in 100-degree heat in Sedona, Arizona, would likely need at least a gallon, or 128 fluid ounces, of water per day to stay properly hydrated. (*Id.* at 223.) And even that amount, was perhaps not enough. (*Id.*) Dr. Hardin's testimony showed that 116 ounces of water was clearly insufficient for Powers' hike. (*See Id.* at 222–24.) Other witnesses, like Mr. Badger, testified that he brought 200 ounces when he responded to the Sycamore fire, which included a short hike to the Taylor Cabin. (*Id.* at 85–87.) Mr. O'Neil also opined that Powers brought an insufficient amount of water. (*Id.* at 244.)

Powers also recklessly relied on his cellphone for navigation, communication, and

as a light source. Cell service in the Sycamore Canyon Wilderness Area—like any remote area—is unreliable. Powers failed to pack any paper maps, guidebooks, a compass, or GPS. Any of one of these materials could have properly guided him or kept him on the trail. Powers also failed to pack enough food, any sort of emergency tool or kit, or signaling device, which is similarly reckless, particularly when hiking alone in a remote area.

### D.     Requested Modifications

Powers also asks this Court to direct the MJ to "correct two errors in the judgment." (Doc. 27 at 29.)  The two errors, which the United States does not oppose, are (1) to remove the reference about waiving his right to appeal in accordance with his "plea agreement" and (2) either delete or replace the "major purchases" provision in the judgment. (Doc. 27 at 29–30; Doc. 34 at 27.) The Court will remand, in part, so that the MJ may modify the judgment to address these errors, and will affirm the judgment in all other respects.

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** affirming in part, and remanding in part, the Magistrate Judge's Judgment. (*U.S. v. Philip Alejandro Powers*, 3:21-mj-04310-CDB (D. Ariz. Feb. 14, 2023) at Doc. 38.)

**IT IS FURTHER ORDERED** that the Court will remand the Magistrate Judge's Judgment so that she may modify the judgment to (1) remove the "plea agreement" provision and (2) replace the second special condition that currently states: "You are prohibited from making major purchases, incurring new financial obligations, or entering into any financial contracts without the prior approval of the probation officer[,]" with "You are prohibited from making major purchases, incurring new financial obligations, or entering into any financial contracts over $500.00 without the prior approval of the probation officer."

**IT IS FURTHER ORDERED** that the Magistrate Judge's Judgment shall be affirmed in all other respects.

**IT IS FINALLY ORDERED** affirming the Magistrate Judge's Order that Philip

Case 3:23-cr-08027-MTL   Document 40   Filed 09/12/23   Page 16 of 16

Alejandro Powers, III, pay Restitution to the United States government in the amount of $293,413.71. (*U.S. v. Philip Alejandro Powers*, 3:21-mj-04310-CDB (D. Ariz. Feb. 14, 2023) at Doc. 36.)

Dated this 11th day of September, 2023.

Michael T. Liburdi
United States District Judge

- 16 -